**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| THE UTILITIES BOARD OF TUSKEGEE individually and on Behalf of a Class of persons similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO: |
| 3M COMPANY, INC.; CORTEVA, INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; and THE CHEMOURS COMPANY FC, LLC., | ) ) ) ) | *TRIAL BY JURY REQUESTED* |
| Defendants. | | |

## COMPLAINT

Plaintiff, The Utilities Board of Tuskegee, brings this Complaint on behalf of itself and on behalf of a Class of other parties similarly situated. Plaintiff and the Plaintiff Class (collectively "Plaintiffs") allege as follows:

## STATEMENT OF THE CASE

1.      This is a class action on behalf of individual Plaintiff and Class Representative The Utilities Board of Tuskegee and a Class of parties similarly situated who have been damaged and continue to be damaged due to the intentional, willful, wanton, reckless, and negligent release of toxic chemicals, including but not limited to perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), precursors and chemicals that degrade to PFOA and/or PFOS, and related chemicals (including, but not limited to C3-C15 compounds such as PFBA, PFBS, PFNA, PFHxs, PFHxA) (collectively "PFAS"). By such wrongful acts and omissions, Defendants have created and maintained a continuing public nuisance causing harm and injury to the Plaintiff and the Proposed Class Members.

2.      Plaintiff, The Utilities Board of Tuskegee, provides drinking water directly to its own residential and commercial customers in Macon County, Alabama.

3.      This is a class action on behalf of Representative Plaintiff the Utilities Board of Tuskegee and a Class of similarly situated drinking water treatment systems that provide drinking water to residents and customers of their respective districts throughout the State of Alabama.

4.      Defendants manufacture, supply, formulate, sell or purchase PFAS, and/or operate manufacturing facilities where PFAS are used and/or subsequently dispose of waste containing PFAS in the State of Alabama.

5.      Defendants' PFAS have contaminated the drinking water utilized by Plaintiffs throughout the State of Alabama, and those chemicals cannot be removed by the water treatment processes currently used by the Class.

6.      As a direct and proximate result of Defendants' contamination of the drinking water sources utilized by Plaintiffs, Plaintiffs have suffered substantial economic and consequential damage, including, but not limited to, expenses associated with the future installation and operation of a filtration system capable of removing and destroying Defendants' PFAS from drinking water; expenses incurred to monitor PFAS contamination levels; expenses incurred to obtain water from another drinking water source with uncontaminated water; and lost profits and sales.

7.      Wherefore, Plaintiffs seek compensatory and punitive damages to the fullest extent allowed by award from a jury.  Plaintiffs also seek equitable and injunctive relief compelling Defendants to remediate their contamination and prevent additional releases of PFAS, and their precursors and byproducts, into their raw water source.

## PARTIES

8.     Plaintiff, The Utilities Board of Tuskegee, and Proposed Class Members are domestic municipal corporations formed pursuant to Ala.  Code §11-50-230 (1975).

9.     Plaintiff, The Utilities Board of Tuskegee's principal place of business is in Macon County, Alabama.

10.     Defendant, 3M Company Inc.  ("3M"), is a foreign corporation organized under the laws of the State of Delaware and qualified to do business in the State of Alabama.  3M has, since 1961, operated a manufacturing facility in Decatur, Alabama, where it manufactured PFAS products.

11.     Defendant, The Chemours Company, is a foreign corporation organized under the laws of the State of Delaware and qualified to do business in the State of Alabama.

12.     Defendant, The Chemours Company FC, LLC, is a foreign limited liability company organized under the laws of the State of Delaware and qualified to do business in the State of Alabama.

13.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

14.     Defendant, E.I.  du Pont de Nemours and Company ("DuPont"), is a foreign corporation organized under the laws of the State of Delaware and qualified to do business in the State of Alabama.

15.     Defendant, Corteva Inc.  ("Corteva"), is a foreign corporation organized under the laws of the State of Delaware and qualified to do business in the State of Alabama.

16.     The Chemours Company, The Chemours Company FC, LLC, DuPont, and Corteva are collectively referred to as "the DuPont Defendants."  The actions and knowledge of DuPont

are imputed to the DuPont Defendants as partial successors to DuPont and reference to DuPont also refers to the DuPont Defendants.

## JURISDICTION

17.     This Court has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a), because Plaintiffs are citizens of the State of Alabama and the named Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This Court also has jurisdiction over this action in accordance with 28 U.S.C. section 1332(d)(2)(A), which grants federal subject matter jurisdiction over any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a Class action in which any Member of a Class of Plaintiffs is a citizen of a State different from any Defendant.  The proposed Class is greater than 100 members, Plaintiffs are residents of the State of Alabama, and the named Defendants are residents of different states.

19.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in Macon County, Alabama in the Middle District of Alabama.

20.     The Court has jurisdiction over 3M because they operate a plant in Alabama from which a portion of the PFAS contamination caused by 3M originated.  The Court likewise has jurisdiction over 3M because they supplied PFAS to manufacturers who discharged PFAS to waterways that supply drinking water in Alabama.

21.     The Court has jurisdiction over the DuPont Defendants because they purchased PFAS from 3M manufactured for it in Alabama, marketed and sold PFAS products to other manufacturers in Alabama, and in particular to Teflon manufacturers.  The Court likewise has

jurisdiction over the DuPont Defendants because they supplied PFAS to manufacturers who discharged PFAS to waterways that supply drinking water in Alabama.

## FACTUAL ALLEGATIONS

22.     PFAS are human-made, synthetic chemicals that do not exist naturally in the environment, are harmful at extremely low levels (in the parts per trillion (ppt)), and were widely used for decades in consumer, household, and other commercial products, as well as industrial uses.  PFAS are a class of nearly 12,000 individual compounds which include PFOA and PFOS.

23.     PFAS are known as the "forever" chemicals because they persist in the environment for an indefinite (and very long) period of time.  PFAS bioaccumulate in the human body and can bio-magnify in animals, particularly fish and "top of the food chain" mammals.  PFAS exposure is correlated with a wide array of harmful health effects, including kidney and testicular cancer, ulcerative colitis, and adverse effects on fetal development during pregnancy, the liver, the immune system, the thyroid, and cholesterol levels.

24.     Defendant, 3M, manufactured PFOA from approximately the 1940s until 2002 and was the exclusive manufacturer of PFOS from approximately the 1940s until 2002.  3M used PFOS in many of its consumer products, including those with Scotchgard.

25.     After 2002 3M replaced PFOS and PFOA with "short-chain" PFAS such as PFBS. Short chain PFAS contain less than eight fluorinated carbon atoms.

26.     Defendant, E.  I.  du Pont de Nemours and Company ("Old DuPont"), manufactured PFOA and products containing PFOA from approximately 2002 until approximately 2013.  Old DuPont used PFOA starting in the 1950s in many of its consumer products, including those with Teflon.  Old DuPont manufactured PFOA until replacing it with the shorter-chain PFAS, such as "GenX," and other short-chain PFAS.  Old DuPont manufactured and used GenX until transferring

its performance chemicals business and some associated liabilities to Defendant, The Chemours Company, in 2015.

27.     The Chemours Company was incorporated as a subsidiary of Old DuPont as of April 30, 2015.  From that time until July 2015, The Chemours Company was a wholly-owned subsidiary of Old DuPont.

28.     In July 2015, Old DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which included its PFAS business. Old DuPont distributed shares of The Chemours Company stock to Old DuPont stockholders, and The Chemours Company has since been an independent, publicly traded company.  The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

29.     Old DuPont merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc.  ("DowDuPont").  Old DuPont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since that time, DowDuPont has separated its businesses into three independent, publicly traded companies for each of its agriculture, materials science, and specialty products businesses.

30.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.  Corteva, Inc. was initially formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.  On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc.  common stock by way of a pro rata dividend.  Following that distribution, Corteva, Inc. is the direct parent

of Old DuPont (i.e., E. I. du Pont de Nemours and Company) and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

31. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of Old DuPont not assumed by Corteva, Inc.

32. Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

33. 3M Company; E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; DuPont de Nemours, Inc., are collectively referred to as "Defendants."

34. Defendants designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS and/or products containing PFAS that were delivered into areas, causing contamination through, *inter alia,* industrial processes and facilities; disposal by industrial process and facilities, wastewater discharge through such processes, and consumer use and disposal of PFAS containing products (other than Aqueous Film Forming Foams), of Plaintiffs' drinking water sources.

35. Defendants' PFAS were and are released into the environment through residential drainage systems. For example, PFAS is removed from residential carpet through vacuum or steam cleaning and through foot traffic, which is ultimately released through residential plumbing. Such releases ultimately end up in drinking water sources in Alabama.

36.   PFAS are released into the environment through both conventional and industrial landfills, where PFAS leach from PFAS containing consumer products and PFAS containing industrial byproducts, such as carpet scrap and food packaging waste.  PFAS then leach into the groundwater or to surface waters through runoff.

37.   Landfill leachate is also transported to industrial wastewater treatment facilities, where it ultimately is released into drinking water sources.  Such releases ultimately end up in drinking water in Alabama.

38.   PFAS are highly mobile in soil, whereupon they leach into groundwater or flow into surface water at landfill or other disposal sites.  Such releases ultimately end up in drinking water sources in Alabama.

39.   PFAS have at times been directly discharged into groundwater and surface waters by both PFAS manufacturers and third-party users of PFAS chemicals in manufacturing processes, where they ultimately end up in drinking water sources in Alabama.

40.   PFAS have been a frequent component in consumer products manufactured in Alabama or manufactured in locations ultimately releasing PFAS into drinking water sources in Alabama.

41.   Conventional wastewater and drinking water treatment processes cannot remove PFAS in significant amounts.  PFAS can only be safely removed through advanced water treatment processes such as reverse osmosis.  Such processes are not in place at the drinking water treatment facilities of Plaintiff or other class members.

42.   The source of PFAS contamination alleged herein are from the above-described types of pollution.  Alabama and its drinking water sources were a primary location for the

manufacture of PFAS and a significant location for PFAS contamination through the manufacture of products containing PFAS as well as the use and disposal of products containing PFAS.

43.     Plaintiff does not allege contamination of drinking water sources occurred through Aqueous Film-Forming Foam.  Contamination found in the drinking water and drinking water sources of Plaintiff and of the class includes PFAS not found in Aqueous Film-Forming Foam.

44.     3M and DuPont knew for decades that PFAS were toxic and posed substantial health and environmental risks, but they each covered up this information and instead promoted these chemical products as safe and appropriate for widespread use.

45.     3M and Dupont sold PFAS to industries in Alabama, and products containing PFAS made by 3M and DuPont were sold into Alabama.

46.     In 2020 and 2022, the Alabama Department of Environmental Management implemented PFAS sampling programs that detected PFAS in the well and treatment plants of 93 water systems across the state including 81 public utilities.

47.     These sampling programs have confirmed that PFAS have entered the drinking water sources of at least these 93 water systems.  To deliver safe, potable water to their customers, these water systems must remove PFAS contaminants through advanced filtration systems not currently in place at these facilities.

48.     Plaintiffs bring this action to recover compensatory damages for these water systems and punitive damages, to ensure that Defendants bear such expense rather than Plaintiffs or their rate payers.  These damages include the cost of advanced filtration to remove all PFAS from drinking water, advanced destruction technologies to properly dispose of PFAS that are removed from drinking water, and the costs to otherwise investigate, monitor, abate, and contain PFAS.

49.    Plaintiffs allege claims based on contamination caused by PFAS including precursors, acids, salts, ionic forms, and byproducts.

50.    Plaintiffs are not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam that contains PFAS.

## HEALTH IMPACTS OF PFAS

51.    PFAS are a family of manmade chemical compounds containing strong carbon-fluorine bonds.  This bond reduces friction and imparts stain, soil, and water resistance to numerous consumer products.

52.    Since they were first manufactured and used in large scale in the early 1950s, PFAS have been used in a variety of consumer products including nonstick cookware, textiles, carpet, and food packaging.  PFAS are also used in a variety of other industries, including aerospace, automotive, building and construction, electronics, and paper/pulp mills.  PFAS were not found in the environment or in humans before the 1950s.

53.    The widespread use of PFAS in a variety of industries and their resistance to degradation have resulted in their release into the environment throughout the United States, including the State of Alabama.  PFAS enter the environment through various means that include, but are not limited to, releases to air, land, and water from industrial processes and facilities; disposal by industrial process and facilities; and from the normal and foreseeable use, and/or disposal of consumer products containing PFAS.

54.    PFAS have been detected in sludge at wastewater treatment plants and/or in septage from septic systems.  Biosolids from sludge at wastewater treatment plants are often used as a soil additive at agricultural sites or in commercial products.  Thus, PFAS contamination through these pathways has greatly expanded the area of PFAS contamination.

55.     PFAS are also known as "forever" chemicals because their strong carbon-fluorine bond ensures that they do not degrade naturally in the environment.  PFAS readily migrate in soil, surface water, and ground water, causing extensive contamination.

56.     The main pathway of exposure for humans is the ingestion of drinking water.

57.     3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

58.     3M was the only known manufacturer of PFOS and PFHxS in the United States.

59.     3M was a major manufacturer of PFOA.

60.     3M manufactured PFOA and PFOS as raw chemical materials for use in 3M products and products made by third parties.

61.     3M manufactured PFAS by electrochemical fluorination beginning in the 1940s. The electrochemical fluorination process results in a product that contains and/or breaks down into compounds containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, among other PFAS.

62.     3M marketed and sold PFAS and products containing PFAS throughout the United States, including in Alabama.

63.     3M manufactured PFAS in its Decatur, Alabama plant and used PFAS in its Guin, Alabama plant.

64.     3M supplied PFAS to third parties for use in manufacturing, including but not limited to DuPont, and throughout the United States, including in Alabama.

65.     DuPont began purchasing PFOA from 3M in 1951 for use in manufacturing DuPont's brand-name Teflon products.  Teflon is commonly known for its use as a coating for non-stick cookware.  DuPont has used PFAS in other brand-name products including Stainmaster.

66.     DuPont marketed and sold PFAS and products containing PFAS throughout the United States, including in Alabama.

67.     DuPont supplied PFAS to third parties for use in manufacturing throughout the United States, including in Alabama.

## 3M'S KNOWNLEDGE OF PFAS RISK

68.     Defendant, 3M, has long been aware of the persistence and toxicity of PFOA, PFOS, and other PFAS, yet it knowingly and intentionally continued to promote and sell these chemicals.

69.     Based on its own internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

70.     In the 1950s, 3M knew that PFAS chemicals had the ability to move through groundwater.  By 1960, 3M knew that PFOA and PFOS were capable of leaching into groundwater and contaminating the environment.

71.     By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

72.     In 1975, 3M scientists were informed that PFAS had been found within, and could build up in, the human body.

73.     In 1975, 3M found PFOA to be "widespread in human plasma" according to samples taken from across the United States.

74.     3M has also known for years that PFAS, including but not limited to, PFOA, PFOS, and related chemicals, are not effectively treated by conventional wastewater treatment plant processes after finding high concentrations of these chemicals in samples taken from the effluent

of a wastewater treatment plant located only a few miles downstream from one of its production facilities.

75.     3M failed to disclose the risks associated with PFAS to regulators or to the public. 3M concealed much of its awareness of the risks associated with PFAS until finally sharing some information with the United States Environmental Protection Agency (EPA) in the late 1990s.

76.     In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000.  In connection with the phase out, 3M issued a press release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

77.     3M worked to control the science on PFAS, misleading the public, regulators, and the scientific community.

78.     In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information."  3M was fined $1.52 million for these violations.

79.     3M knew or should have known that, in their intended and/or common use, PFAS (including products containing PFAS and PFAS used in industrial processes) would contaminate the environment and harm Plaintiffs' drinking water.

### DUPONT'S KNOWLEDGE OF PFAS RISKS

80.     Like 3M, DuPont has known for decades of the health and environmental risks of PFAS but instead of warning the public, users, or consumers about such risks, covered up this information and promoted PFAS and PFAS-containing products as safe.

81.     In approximately 1951, DuPont started using PFOA in making Teflon at its Washington Works manufacturing plant in Parkersburg, West Virginia.  As early as 1954,

employees at DuPont's Washington Works plant reported that C8 (another name for PFOA) might be toxic.

82.     By 1961, DuPont's researchers had concluded that PFOA was toxic.

83.     As early as 1966, DuPont was aware that PFOA could leach into groundwater.

84.     By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers thought could be a potential result of human exposure to PFOA.

85.     By at least 1980, DuPont had internally confirmed that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

86.     In 1984, DuPont recognized their liability for the past 32 years and despite internal positions to totally eliminate PFOA, DuPont continued to use PFOA for economic reasons.

87.     By the mid-1980s, DuPont was aware that PFOA is bio-persistent and bio-accumulative.

88.     In 1988, DuPont began treating PFOA internally as a possible human carcinogen.

89.     DuPont knew that PFOA from its manufacturing facilities had contaminated local water utilities.

90.     Although DuPont knew about the health and environmental risks of PFAS from its use of PFAS starting in 1951, DuPont began manufacturing its own PFAS chemicals in 2002 for use in manufacturing when 3M phased out production of PFOA.

91.     By December 2005, EPA uncovered evidence that DuPont had concealed the environmental and health effects of C8 for more than two decades.  In response, EPA levied a $16.5 million administrative penalty against DuPont, which at that time was the largest civil administrative penalty EPA had ever obtained under any federal environmental statute.

92.     3M and DuPont were the only companies to manufacture PFOA in the United States.

93.     DuPont continued to manufacture, market and sell PFOA and products containing PFOA as a byproduct until at least 2013.

94.     DuPont knew, or should have known, that PFAS would contaminate the environment and Plaintiffs' drinking water through their manufacturing, marketing, distribution, and sales of PFAS chemicals and consumer, household, and other commercial products and materials containing PFAS.

## GOVERNMENTAL ACTIONS

95.     The EPA took regulatory action on March 11, 2002, and December 9, 2002, by publishing two significant new use rules under the Toxic Substances Control Act to limit the future manufacture and use of PFOA, PFOS, and related chemicals.

96.     The majority of a United States Environmental Protection Agency ("EPA") Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans."

97.     In 2009, the EPA published provisional drinking water health advisories for PFOA and PFOS, the limits being 0.4 parts per billion (ppb) for PFOA and 0.2 ppb for PFOS.

98.     More recent studies have shown that the 2009 EPA advisory limits were far too high.  In 2014, the EPA released a draft of its proposed "reference dose" for PFOA, which is an estimate of how much a person could safely consume daily over their lifetime.  That proposed reference dose translated to a limit of 0.1 ppb for PFOA, which was one-quarter the 2009 advisory level.

99.     In May 2016, the EPA issued a new drinking water health advisory for PFOA and PFOS, warning that exposure to elevated levels of these compounds can lead to a number of health problems, such as cancer in adults and developmental effects in fetuses and breastfed infants.  This advisory stated that, to provide a margin of protection from lifetime exposure to PFOA and PFOS in drinking water, the combined concentration of these chemicals should be no greater than 0.07 ppb or 70 parts per trillion (ppt).  The EPA health advisory was based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals, as well as epidemiological studies of human populations exposed to these chemicals.

100.     On June 15, 2022, the EPA again lowered the 2016 drinking water health advisory to an interim updated health advisory of 0.004 ppt for PFOA and 0.02 ppt for PFOS.  It also issued new drinking water health advisories for 10 ppt for GenX compounds and 2,000 ppt for PFBS.

101.     In addition to these actions taken by the federal government, numerous states have established their own standards limiting the concentration of certain PFAS in drinking water that are more stringent than the EPA's 2016 lifetime health advisories for PFOA and PFOS.

102.     The State of Alabama has not promulgated its own drinking water health advisories for PFAS.  Therefore, the EPA's new drinking water health advisories for PFOA, PFOS, PFBS, and GenX govern the applicable levels in the State of Alabama.

## CLASS ACTION ALLEGATIONS

103.     Plaintiff incorporates all prior paragraphs as if restated herein.

104.     Representative Plaintiff and Members of the proposed Class are drinking water treatment providers in Alabama whose property interests have been damaged through contamination of their drinking water.

105.    The Class proposed by the Representative Plaintiff and those it represents is as follows:

## **CLASS DEFINITION**

106.    The class proposed by the Plaintiff and those it represents includes the owners of all drinking water utilities within the State of Alabama whose finished drinking water has contained a detectable concentration level of PFOA, PFOS, GenX, or PFBS that exceeds the advisory levels announced by the EPA on June 15, 2022.

107.    Excluded from the Class are:

a.    Any drinking water treatment provider who is currently in litigation or was previously in litigation concerning the subject matter of this case;

b.    Defendants and any entities in which Defendants have a controlling interest;

c.    Any of the legal representatives, heirs, successors, or assigns of Defendants;

d.    The Judge to whom this case is assigned, and any Member of the Judge's immediate family and any other judicial officer assigned to this case;

e.    Any drinking water treatment system that properly executes and timely files a request for exclusion from the Class;

f.    Any drinking water treatment provider in Morgan County, Lawrence County, Franklin County, Limestone County, Colbert County, or Lauderdale County, Alabama.

108.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

109.    This action on behalf of Representative Plaintiff and all others similarly situated has been brought and may be properly maintained pursuant to the provisions of Fed. R. Civ. P. 23.

110.    **Numerosity of the Class**: The members of the class are so numerous that separate joinder of each member is impractical, within the meaning of Fed. R. Civ. P. 23(a)(1).  The putative class members are readily identifiable through PFAS sampling results published by ADEM and may be given any required notices by regular mail, supplemented, if necessary and required by the Court, by published notice.

111.    **Common Questions of Fact and Law**: The claims of the Representative Plaintiff raise questions of law and fact common to the claims of each member of the class, as required by Fed. R. Civ. P. 23(a)(2).  The common questions of law and fact predominate over the questions affecting only individual class members.  The common questions of law and fact include at least one of the following:

a.    The factual history of the use, development, and distribution of PFOS, PFOA, and other PFAS, manufactured and used by the Defendants.

b.    When the Defendants knew of the harmful effects of PFOS, PFOA, and other PFAS, and yet continued to manufacture, dispose, discharge into the environment contaminating Plaintiffs' drinking water sources.

c.    Whether the Defendants failed to disclose the harmful effects of PFOS, PFOA, and other PFAS being released, discharged, or deposited from their plants and from products containing PFAS throughout Alabama.

d.    Whether the raw water treated by Representative Plaintiff and Class Members have been contaminated with PFAS.

e.     Whether  Defendants  invaded  Representative  Plaintiff's  and  Class Members' property with knowledge of the violation of the rights in their property.

f.     Whether  Defendants'  intentional  misconduct  constitutes  a  continuing trespass.

g.     Whether the Defendants' misconduct constitutes a continuing nuisance.

h.     Whether the Defendants were negligent in manufacturing, selling, transporting, releasing, discharging, and depositing PFOS, PFOA, and other PFAS compounds, and products.

i.     Whether, as a direct and proximate results of the Defendants' wrongful acts and omissions over a period of years, the Plaintiffs and class members have suffered injuries and damages.

j.     The  necessary  remedial  actions  to  prevent  Defendants'  chemicals  from contaminating Representative Plaintiff's and Class Members' raw water supplies at levels that exceed EPA advisory levels.

k.     The appropriateness of injunctive relief to prevent Defendants' chemicals from  entering  Representative  Plaintiff's  and  Class  Members'  water  treatment systems.

112.   **Typicality**: The Representative Plaintiff's claims are typical of the claims of the members of the class, as required by Fed. R. Civ. P. 23(a)(3).  The claims are typical because the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by the Representative Plaintiff are the same kinds of damages suffered by the members of the class.

113.   **Adequacy of Representation**: The Representative Plaintiff can fairly and adequately protect and represent the interests of each member of the class as required by Fed. R. Civ. P. 23(a)(4).  The Representative Plaintiff will fairly and adequately protect and represent the interests of the members of the class based on the following facts and circumstances: their interests do not conflict; their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories; they are similarly damaged and are seeking the same remedies; and they intend to prosecute this action vigorously.  Plaintiff has retained counsel competent and experienced in complex class action and toxic tort litigation.

114.   The Defendants have acted on grounds generally applicable to all members of the proposed class, making final declaratory and injunctive relief concerning the class as a whole appropriate within the meaning of Fed. R. Civ. P. 23(b)(2).

115.   Common questions of fact and law between the Representative Plaintiff and Members of the Class predominate over questions affecting only individual Class Members, within the meaning of Fed. R. Civ. P. 23(b)(3).  Some of the common issues are set forth in Paragraph 111 above.

116.   Additionally, Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy.  Certification under Fed. R. Civ. P. 23(b)(3) would be proper in that, among other things: there is no interest by Members of the Class in individually controlling the prosecution of separate actions; the expense of prosecuting individual claims for the matters for which Class certification is sought would be prohibitive in light of the typical claimant's injuries; neither the Representative Plaintiff nor Members of the proposed Class have filed or are parties to any litigation in which the legal and factual issues raised herein are to be adjudicated, and it is desirable to concentrate the litigation of claims in a single

proceeding so as to avoid unnecessary and expensive duplication of actions and to provide for judicial economy.  Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

117.    Class action treatment is preferable to other available methods in providing a fair and efficient method for the adjudication of the controversy described herein, which has affected a large number of persons and entities.  The Class action provides an effective method whereby the enforcement of the rights of the Plaintiffs can be fairly managed without unnecessary expense or duplication.

## COUNT ONE

### Negligence

118.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

119.    Defendants owed a duty to Plaintiff to exercise due and reasonable care in their manufacturing operations to prevent the contamination of PFAS into water supply.

120.    As described herein, Defendants breached the duty owed to Plaintiff, and under the circumstances, Defendants' breaches constitute negligent, willful, and/or reckless conduct.

121.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Plaintiff has incurred expenses and will incur reasonably ascertainable expenditures in the future.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT TWO

### Public Nuisance

122.     Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

123.     Plaintiff, The Utilities Board of Tuskegee, owns and occupies property used to serve its water customers, including a water treatment plant, water distribution system, and offices.

124.     Defendants have created a nuisance by failing to prevent the contamination of PFAS into the waters throughout the State of Alabama, which has caused contamination of the Plaintiff's water supply, thereby causing Plaintiff hurt, inconvenience, and harm.

125.     The specific damages incurred by Plaintiff include, but are not limited to, expenses associated with the future installation and operation of a filtration system capable of removing Defendants' chemicals from the water; expenses incurred to monitor PFAS contamination levels; expenses incurred to purchase water from any other water system; expenses to properly dispose of PFAS removed from drinking water; and lost profits and sales.  These special damages are unique to drinking water treatment providers like Plaintiff.

126.     In addition to the special damages sustained by Plaintiff, the levels of toxic chemical contamination found in the Plaintiff's water supply, directly caused by Defendants' conduct, have created a condition that threatens the health and well-being of Plaintiff's customers.

127.     It was reasonably foreseeable, and in fact known to Defendants, that their actions would place, and have placed, the Plaintiff at risk of harm.  The nuisance has caused substantial damages and will continue to cause damages until it is satisfactorily abated.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT THREE

### Private Nuisance

128.     Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

129.     Defendants have created a nuisance by their failure to prevent the contamination of PFAS into the public waters throughout the State of Alabama including the Plaintiff's water supply, thereby causing Plaintiff hurt, inconvenience, and harm.

130.     The contamination of the water at Plaintiff's intake site constitutes a private nuisance depriving Plaintiff of its ability to deliver clean and uncontaminated water to its customers.

131.     It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, the water at Plaintiff's intake site.  The nuisance has caused substantial damage and will continue to cause damages until it is satisfactorily abated.

132.     WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT FOUR

### Trespass

133.     Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

134.     Plaintiff owns and occupies property used to serve its water customers, including a water treatment plant, water distribution system, and offices.

135.     Defendants' intentional acts in failing to contain the discharge of PFAS knowing that they would contaminate the water supplies, caused an invasion of Plaintiff's property by

Defendants' chemicals, which has affected and is affecting Plaintiff's interest in the exclusive possession of its property.

136.    Plaintiff did not consent to the invasion of its property by Defendants' chemicals.

137.    Defendants knew or should have known that their PFAS would contaminate the water supply and result in an invasion of Plaintiff's possessory interest in their property.

138.    Defendants' trespass is continuing.

139.    Defendants' continuing trespass has impaired Plaintiff's use of its property and has caused it damages by diminishing its value.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT FIVE

### Wantonness and Punitive Damages

140.    Plaintiff re-alleges all prior paragraphs as if restated herein.

141.    Defendants owed a duty to Plaintiff to exercise due and reasonable care in their manufacture, distribution, supply, and sell of PFAS to users throughout the State of Alabama and to prevent the discharge of PFAS into the water supply.

142.    In breaching the duties described above, Defendants acted in a wanton, willful, and reckless manner.

143.    Defendants knew or should have known the danger to Plaintiff created by Defendants' conduct, practices, actions, and inactions.

144.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on the Plaintiff.

145.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard of the known risk of harm to the Plaintiff.

WHEREFORE, Plaintiff demands judgment for punitive damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT SIX

### Injunctive Relief

146.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

147.    Plaintiff requests that this Court enter an Order enjoining Defendants from continuing the conduct described above and requiring Defendants to take all steps necessary to remove their chemicals from Plaintiff's water supplies and property.

148.    There is continuing irreparable injury to Plaintiff if an injunction does not issue, as Defendants' chemicals in its water supplies pose a continuing threat to Plaintiff's property interests, and there is no adequate remedy at law.

WHEREFORE, Plaintiff demands injunctive relief against all Defendants, jointly and severally, requiring Defendants to remove their chemicals from Plaintiff's water system and to prevent these chemicals from continuing to contaminate Plaintiff's water supply.

## RELIEF DEMANDED

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

a)    Award Plaintiff damages in an amount to be determined by a jury sufficient to compensate it for removing PFAS from Plaintiff's drinking water, disposing of PFAS removed from Plaintiff's drinking water, real property damage, out of pocket expenses, lost profits and sales, and future expenses.

b)      Issue an injunction requiring Defendants to remove their chemicals from Plaintiff's water supply and to prevent these chemicals from continuing to contaminate Plaintiff's water supply.

c)      Award attorney fees and costs and expenses incurred in connection with the litigation of this matter.

d)      Award such other and further relief as this Court may deem just, proper, and equitable.

WHEREFORE, the Representative Plaintiff pray that this case will be certified pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3) to proceed as a class action.

## **JURY DEMAND**

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Dated: July 17, 2022.

Respectfully submitted,

/s/ Rhon E.  Jones_____
JERE L.  BEASLEY (BEA020)
Jere.Beasley@beasleyallen.com
RHON E.  JONES (JON093)
Rhon.Jones@beasleyallen.com
RICHARD D.  STRATTON (STR021)
Rick.Stratton@beasleyallen.com
MATT GRIFFITH (GRI085)
Matt.Griffith@beasleyallen.com
DAVID L.  DIAB (DIA016)
David.Diab@beasleyallen.com
JEFF PRICE (PRI086)

Jeff.Price@beasleyallen.com
GAVIN KING (KIN099)
Gavin.King@beasleyallen.com
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.
P.O.  Box 4160
Montgomery, Alabama 36103
T: 334-269-2343
F: 334-954-7555


Attorneys for Plaintiff