IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE UTILITIES BOARD OF TUSKEGEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:22-CV-420-WKW |
| | ) | [WO] |
| 3M COMPANY, INC., *et al.,* | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

"Nothing sticks," to Teflon nonstick cooking pans. But the toxic chemicals used to make those pans and countless other products stick to the environment "forever."[1] This putative class action alleges that those toxic chemicals dangerously contaminated the drinking water in Tuskegee, Alabama.[2] Representative Plaintiff The Utilities Board of Tuskegee (UBT), the municipal water utility that provides drinking water to Tuskegee, alleges that Defendants engaged in tortious conduct under Alabama law when they designed, manufactured, marketed, and sold chemicals and chemical-laden products despite knowing that their normal and

---

[1] According to Plaintiff.

[2] The proposed class consists of "the owners of all drinking water utilities within the State of Alabama whose finished drinking water has contained a detectable concentration of PFOA, PFOS, GenX, or PFBS that exceeds the advisory levels announced by the [U.S. Environmental Protection Agency] on June 15, 2022." (Doc. # 1 at 17.)

foreseeable use and disposal would dangerously contaminate UBT's water source, rendering it unusable for safe drinking. UBT wants safe drinking water, and it wants Defendants—the companies who allegedly contaminated its rightful water source— to make it happen.

Pending before the court is a motion to dismiss filed by 3M Company, Inc. (3M) (Doc. # 27), and a motion to dismiss jointly filed by E.I. du Pont de Nemours and Company, the Chemours Company FC, LLC, and the Chemours Company (collectively, DuPont) (Doc. # 25).[3]  The motions are fully briefed and ripe for resolution. (Docs. # 32, 33, 38, 39). As explained below, the motions will be denied in part and granted in part.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is proper under 28 U.S.C. § 1332(a) and 28 U.S.C § 1332(d)(2)(A). The parties do not contest personal jurisdiction or venue.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl.*

---

[3]  When appropriate, DuPont and 3M will be collectively referred to as "Defendants."

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient.  *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citing *Twombly*, 550 U.S. at 557).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (citations omitted) (internal quotation marks omitted).  A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).  The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

For purposes of Fed. R. Civ. P. 12(b)(6), the plaintiffs' allegations are presumed true.  As such, the facts are taken from the complaint.  (Doc. # 1.)  *See*

*Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)) ("When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'"). However, legal conclusions unsupported by factual allegations are not entitled to that assumption of truth. *See Iqbal*, 556 U.S. at 662.

### III.  BACKGROUND

Like many water utilities, UBT is a municipal waterworks plant and distribution system that provides drinking water to its own residential and commercial customers. UBT pulls water from a public waterway, treats it, and then sells it to the people of Macon County, Alabama. UBT is outfitted with conventional drinking water filtration and treatment systems, but its current facilities lack the capability to effectively treat per- and polyfluoroalkyl substances, which are known as PFAS. In 2022, UBT's drinking water, post-treatment, contained a detectable level of PFAS that exceeds health-advisory levels announced by the EPA on June 15, 2022.

PFAS are a family of human-made synthetic chemical compounds that do not exist naturally in the environment. For decades, they were widely used in consumer, household, and other commercial products—like nonstick cookware, textiles, carpet, and food packaging. PFAS exposure is correlated with a wide array of harmful

health effects, including kidney and testicular cancer, ulcerative colitis, and adverse effects on fetal development during pregnancy, among many others. Importantly, PFAS are bioaccumulative and biopersistent—meaning that PFAS accumulate in the body overtime, and they persist in the environment (without breaking down or degrading naturally) for an indefinite period. UBT alleges that PFAS's capacity to persist for a long period of time has caused them to be termed "forever" chemicals. (Doc. # 1 at 5.)

The main pathway of PFAS exposure for humans is the ingestion of drinking water. PFAS can enter water in many ways. PFAS can be discharged directly into waterways. PFAS can also be released into water through the "normal and foreseeable use and/or disposal of consumer products containing PFAS." (Doc. # 1 at 10.) For example, products and byproducts containing PFAS (like, carpet scraps and food packaging waste) are placed into landfills, where the PFAS from those products then runs off and/or leaches into groundwater and surface water. PFAS can also contaminate water through residential drainage systems. Runoff from PFAS-containing products like non-stick cookware can enter residential plumbing via their normal use which is then ultimately released into public waterways and drinking water sources. Additionally, PFAS can enter waterways through various industrial processes during its manufacture, use, and disposal. Generally, "PFAS readily migrate in soil, surface water, and ground water, causing extensive contamination."

(Doc. # 1 at 11.)

In sum, UBT alleges that PFAS entered its water source through industrial processes and facilities, disposal by industrial process and facilities, wastewater discharge through such processes, and through the normal and foreseeable consumer use and disposal of PFAS and PFAS containing products. Crucially, UBT alleges that the water contamination was a result of the ordinary, foreseeable, and normal use, discharge, and disposal of PFAS and PFAS products, not from improper/unforeseeable disposals or discharges by end-users. UBT does not allege any negligence by unnamed third parties. Rather, UBT's claims are directed at the companies who introduced PFAS into the stream of commerce: Defendants DuPont and 3M.

Defendants first began supplying PFAS or products containing PFAS in large quantities during the early 1950s. 3M is the only known manufacturer of PFOS, one type of toxic PFAS found in UBT's water supply. 3M and DuPont together were the only companies to manufacture PFOA, another toxic PFAS found in UBT's water supply. UBT alleges that "3M knew or should have known that, in their intended and/or common use, PFAS (including products containing PFAS and PFAS used in industrial processes) would contaminate the environment and harm Plaintiffs' drinking water," (Doc. # 1 at 13), and that "DuPont knew, or should have known, that PFAS would contaminate the environment and Plaintiffs' drinking

water through their manufacturing, marketing, distribution, and sales of PFAS chemicals and consumer, household, and other commercial products and materials containing PFAS." (Doc. # 1 at 15.)

In support, UBT alleges that both 3M and DuPont knew for decades that toxic PFAS were harmful to humans and the environment, that PFAS was biopersistent and bioaccumulative, and that PFAS could contaminate public waterways through runoff and leachate, among other means. UBT alleges that DuPont had internally confirmed, as early as 1984, that "continued exposure to [PFOA] is not tolerable" and that DuPont held internal positions calling for PFOA to be "totally" eliminated. (Doc. # 1 at 15.) Similarly, UBT alleges 3M knew for years that PFAS could not effectively be treated by conventional wastewater treatment processes. (Doc. # 1 at 12.) But despite this knowledge, and for economic reasons, Defendants continued to promote, design, manufacture, supply, and sell PFAS and PFAS containing products without reasonable care. Moreover, UBT alleges that Defendants actively took steps to conceal their knowledge and control the science on PFAS by misleading regulators and scientists.

Over 70 years after Defendants first began their PFAS-related industry, on June 15, 2022, the EPA released updated drinking water health advisories for PFOA and PFOS. In them, the EPA lowered the health advisories for lifetime exposure to PFOA and PFOS contaminants in drinking water to .004 parts per trillion and .02

parts per trillion, respectively.  The advisories indicate the level of drinking water contamination below which adverse health effects are not expected to occur.  Around the same time, the Alabama Department of Environmental Management (ADEM) sampled UBT's water treatment plant, and detected several types of PFAS, including PFOS and PFOA in levels that exceeded EPA's lifetime-health advisory levels.  Not only was UBT's water contaminated, but UBT alleges that 93 other water utilities across Alabama also tested positive for certain PFAS in excess of EPA's advisory level.  A month later, UBT filed this action alleging that Defendants caused the PFAS contamination of UBT's water supply.  UBT seeks "expenses associated with the future installation and operation of a filtration system capable of removing and destroying Defendants' PFAS from drinking water; expenses incurred to monitor PFAS contamination levels; expenses incurred to obtain water from another drinking water source with uncontaminated water; and lost profits and sales," among others.  (Doc. # 32 at 2).  UBT further seeks an injunction "requiring Defendants to remove their chemical from [UBT's] water supply and to prevent these chemicals from continuing to contaminate Plaintiff's water supply."[4]  (Doc. # 1 at 26.)

---

[4] Defendants have requested the court to take judicial notice of a prior lawsuit filed against UBT in 2019.  (Doc. # 25; (Doc. # 27).  The court declines to do so because the existence of that suit does not resolve the pending issues and because the allegations made in that suit are disputed.  Fed. R. Evid. 201; *see also infra* n.14.

## IV.  DISCUSSION

Unlike many toxic-tort, water-contamination cases, this one does not deal with allegations of improper, direct discharges.  Rather, this case is about the downstream consequences of the introduction of PFAS into the stream of commerce, and whether the introducing entities can be held liable in tort where the normal and foreseeable use and disposal of the PFAS and PFAS containing products, as sold, predictably caused the dangerous contamination of a public drinking water source.  In determining this case, the court looks to clearly established Alabama tort law and well-settled motion-to-dismiss precedent.

In total, UBT brings six counts under Alabama law against both Defendants:

(1) Negligence (Count One)

(2) Public Nuisance (Count Two)

(3) Private Nuisance (Count Three)

(4) Trespass (Count Four)

(5) Wantonness (and Punitive Damages) (Count Five)

(6) Injunctive Relief (Count Six)

(Doc. # 1 at 21–25.)

Defendants move to dismiss all claims on various grounds.  (Docs. # 25, 27.)  The analysis will proceed as follows.  The court will (1) explain why UBT has plausibly alleged a cognizable injury under Alabama law; (2) explain why

9

Alabama's statute of limitations does not clearly bar UBT's claims; (3) address the arguments directed at the merits of each individual tort claim (negligence, wantonness, nuisance, and trespass); (4) explain why injunctive relief may be an available remedy; and (5) deny DuPont's Rule 12(b)(7) motion for failure to join a required party.  Ultimately, Defendants' motions to dismiss will be granted as to the trespass and private nuisance claims; the motions will be denied in all other respects.

### A.    Whether Plaintiff Has Alleged a Legally Cognizable Injury

3M argues that UBT's claims fail because UBT has not yet suffered a legally cognizable injury.  (Doc. # 27 at 3–8.)  3M contends that UBT has not been injured because there is not a binding regulation that requires UBT to clean PFAS from its water.  (Doc. # 39 at 3.)  Put differently, 3M argues that water contamination has not injured UBT because, while the contamination may be dangerous (and is dangerous, according to the EPA's guidelines), water-contamination injuries *only* become cognizable if the water is out-of-compliance with a binding governmental regulation.  This is demonstrably wrong.[5]

---

[5]    3M also argues that "[f]uture spending, unless required by law, is simply not compensatory damage."  (Doc. # 27 at 3.)  This is not the law.  The threat of future spending is not compensatory damage, but future spending to make a plaintiff whole from injuries sustained is textbook compensatory damages.  *See Brown v. Lawrence,* 632 So. 2d 462 (Ala. 1994) (allowing damages for future pain and suffering); *Mobile Infirmary Med. Ctr. v. Hodgen,* 884 So. 2d 801 (Ala. 2003) (allowing damages for future medical expenses); *Joseph Land & Co. v. Gresham*, 603 So. 2d 923 (Ala.1992) (allowing damages for lost future income and wages).

UBT alleges that Defendants injured it by contaminating its drinking water source to a level that exceeds health advisory levels and that "threatens the health and well-being of [UBT's] customers." (Doc. # 1 at 23.) That is, UBT alleges that Defendants have interfered, inconvenienced, and harmed its ability to use its drinking water source. UBT further alleges that, as a result of the contaminated water source, "UBT has suffered substantial economic and consequential damage, including, but not limited to, expenses associated with the future installation and operation of a filtration system capable of removing and destroying Defendants' PFAS from drinking water; expenses incurred to monitor PFAS contamination levels; expenses incurred to obtain water from another drinking water source with uncontaminated water; and lost profits and sales." (Doc. # 32 at 2.) These allegations are sufficient to plausibly plead a legally cognizable injury upon which relief may be granted, regardless of the lack of a binding regulation.

"Alabama law has long required a manifest, present injury before a plaintiff may recover in tort." *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So. 2d 827, 829 (Ala. 2001). However, Alabama law refuses to "recognize as an 'injury' or 'damage' . . . a 'concern' that a product 'could later' cause a harm." *Id*. "The threat of future harm, not yet realized, is not enough." *Id.* (quoting W. Page Keeton et al., *The Law of Torts* § 30, at 165 (5th ed. 1984)). Here, however, UBT does not allege that there is merely a threat of future harm, it alleges that the harm has already occurred. The

water is already polluted to an unsafe level that actively causes UBT financial damage and hamstrings UBT's *raison d'etre*: its ability to serve safe drinking water to the community's citizens.  Accordingly, this is not a threat of harm case where the plaintiff alleges injury that is contingent upon something else happening; UBT alleges that the injury has already happened regardless of the occurrence of conditions subsequent.

3M rejects this theory and asserts that UBT's alleged injury is inherently dependent on a specific condition subsequent:  Noncompliance with a binding governmental regulation.  (Doc. # 39 at 3.)  Defendants argue that there is no harm based on water contamination because UBT is not forced by federal or state regulation to clean the PFAS.  As Defendants put it, "Plaintiff has not been required to spend money to come into compliance with a new, enforceable PFAS standard. If and when Plaintiff's anticipated harm actually occurs, Plaintiff may be able to state a valid tort claim, but until then it cannot establish that such potential harm is anything more than speculative." (Doc. # 39 at 3.)

To support this rule, Defendants cite *Iberville Parish Waterworks District No. 3 v. Novartis Crop Protection, Inc.,* 45 F. Supp. 2d 934 (S.D. Ala.), *aff'd without op.*, 204 F.3d 1122 (11th Cir. 1999).  The court in *Iberville* found that a plaintiff lacks Article III standing for a water-contamination suit until the time that the pollution exceeds binding regulatory requirements. *Id.*  Notably, *Iberville* is not

12

binding, and the logic used to support its finding has been rejected by the Eleventh Circuit. *See Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1174 (11th Cir. 2014) (applying Florida law and rejecting the premise that contaminants exceeding regulatory requirements is essential to stating an injury at the motion-to-dismiss stage).   Like the Eleventh Circuit applying Florida law, the court here finds "no basis to impose" a rule under Alabama law that requires plaintiffs to show that "the level of pollution exceeds regulatory [contaminant] level[s]" to show "cognizable injury or damages stemming from []water contamination." *Id*.   Alabama law does not pronounce such a rule.   And neither does commonsense nor the application of well-settled factfinding frameworks endorse the imposition of such a rule.[6]

Defendants do rightly argue that whether water is unsafe is not necessarily disposed of by noncompliance with the EPA's non-binding advisory guidelines.   But on the other side of that same token, the absence of a binding EPA regulation does

---

[6] Other persuasive authority has also rejected *Iberville*'s bright-line regulatory requirement test for water contamination and suggests that contaminants below regulatory requirements can create viable injuries. *See City of Greenville, Ill. v. Syngenta Crop Prot., Inc.*, 756 F. Supp. 2d 1001, 1007 (S.D. Ill. 2010) (finding that a "water provider may demonstrate an injury in fact even if its finished water does not exceed a[] [contaminant regulation] if its use of the water to meet its statutory obligations to the public becomes more costly because of a defendant's conduct."); *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 764 (S.D. W. Va. 2009) (finding a viable injury at the summary judgment stage because the evidence suggested that "human exposure to PFOA concentrations below regulatory guidelines could nevertheless cause human diseases"); *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* 458 F. Supp. 2d 149 (S.D.N.Y. 2006) (holding that while regulatory levels can define injury to owners of contaminated property, they do not *necessarily* define injury).

13

not factually negate the plausible reality that the water is indeed unfit for human consumption.   Manifest and present injuries-in-fact are not destroyed or made necessarily speculative by the absence of a binding federal regulation.   Rather, in some cases, like this case, the alleged injury itself may be subjected to factfinding and an evidentiary record to determine if the allegations of harm hold water.   *See Russell Corp. v. Sullivan*, 790 So. 2d 940, 951 (Ala. 2001) (reiterating that under Alabama law a water contaminator may still be liable in tort when "their actions were in accordance with state and federal regulations," if plaintiff proves the elements of the tort).   "[W]hile the applicable regulatory standard may be instructive for a trier of fact as evidence of what the government deems safe for the public," it does not amount to an all-purpose benchmark for determining as a matter of law how much one can reasonably contaminate water sources, "much less a threshold issue that plaintiffs must preemptively address at the pleading stage to state a tort claim." *Adinolfe*, 768 F.3d at 1174; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods.*, 458 F. Supp. 2d 149, 158 (S.D.N.Y. 2006) (concluding that while a regulatory level "may serve as a convenient guidepost in determining that a particular level of contamination has likely caused an injury, [the regulatory limit] does not define whether an injury has occurred"); Ala. Code § 6–5–120  ("The fact that the act done may otherwise be lawful does not keep it from being a[n injurious] nuisance.").

14

It would be an abuse of discretion to ignore the plausible allegations of dangerous water contamination asserted in the complaint without developing the record to determine, as a matter of fact, whether the contamination alleged makes the water unfit for drinking (and therefore, unfit for use by UBT). The answer may not be easy. It may be scientifically demanding and difficult even for experts; but if UBT can prove that Defendants' conduct forces it to clean, remediate, and filter its water supply in order to restore it to its normal use, or alternatively, to shut down operation, then UBT has suffered an injury-in-fact. *See W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1234 (N.D. Ala. 2016). For example, if UBT can prove that it would be liable to customers for injuries resulting from the sale of its PFAS contaminated water, then UBT is liable for cleaning its unfit water and therefore has unambiguously sustained an injury).[7] *See Jones v. Crawford*, 361 So. 2d 518, 521 (Ala. 1978) (explaining that an injury exists if a

---

[7] This hypothetical illustrates why the court cannot accept Defendants' proposed rule. If one of UBT's customers gets cancer from drinking contaminated water and UBT is found liable for that injury, then clearly the water was contaminated to an injurious level, regardless of regulatory requirements. UBT need not wait for that hypothetical outcome to state a viable injury if it can already establish, as a matter of fact, that its water supply is contaminated to an unsafe level. That is, in the absence of regulation, UBT does not have to harm others to prove that it has been harmed. Such a rule would incentivize intentionally hurting others and put UBT in a catch-22 of being liable for harms caused by contaminated drinking water but unable to seek a remedy against the contaminator. *See* Damages terminology, Alabama Law of Damages § 36:2 (6th ed.) (noting that "[i]n all cases, necessary expenses, consequent upon the injury done, are a legitimate item in the estimate of damages."); *see also Costa v. Sam's E., Inc.*, 2012 WL 3206362, at *3 (S.D. Ala. Aug. 6, 2012) (reiterating in the medical context that a "plaintiff is not require to prove that he actually paid the claimed []expenses but only that he was liable for payment of them.").

plaintiff is "liable" for future expenses or has "become obligated to pay" for something as a result of tortious conduct against them).

At bottom, UBT alleges that Defendants have contaminated its water source to a level that makes it unsafe, dangerous, and unfit for normal use.  (Doc. # 1 at 22.) Further, because of this contamination, UBT is forced to incur costs to remediate the contamination, among many other financial injuries.   Accordingly, UBT has plausibly alleged an actual, present injury that is legally cognizable under Alabama law.[8] *See W. Morgan-E. Lawrence Water & Sewer Auth.*, 208 F. Supp. 3d at 1234 (applying Alabama law and finding a cognizable injury-in-fact on plausible allegations that "defendants' actions have forced [plaintiffs] to purchase water filters" where the public water source was contaminated at a level higher than EPA *advisory* guidelines and there was other scientific evidence that the water was unsafe to drink).[9]

### B.   Whether Plaintiff's Claims Are Time-Barred

Defendants contend that UBT's negligence, nuisance, and wantonness claims are time-barred by Alabama's statute of limitations.  (Docs. # 25 at 11, # 27 at 9.)

---

[8] To be clear, contrary to 3M's briefing, the court does not find that "the mere presence of PFAS in Plaintiff's source water constitutes a cognizable injury."  (Doc. # 39 at 10.)  Rather, it is the allegedly harmful level of PFAS that renders the water unsafe and unfit for use that creates cognizable injuries.  Trace molecules of anything in public drinking water that do not disrupt the use of that water do not create cognizable injuries.

[9] Note that this section only addresses whether UBT has sufficiently alleged a cognizable injury.  It does not address the scope of damages or viability of any potential remedies.

The statute of limitations for UBT's negligence, nuisance, and wantonness claims is two years.[10]  *See* Ala. Code. § 6-2-38.  The parties agree about that.  They disagree about when UBT's claims accrued.  That is, they pinpoint different dates as to when the two-year statute of limitations began to run.  UBT filed the complaint on July 17, 2022.  If its claims accrued before July 17, 2020, the claims are time-barred; if the claims accrued after July 17, 2020, then they are not time-barred.  For the following reasons, UBT's claims are not clearly barred by Alabama's statutes of limitations, and therefore the motions to dismiss on statute of limitations grounds will be denied.

"The statute of limitations begins to run when the cause of action accrues, which the [Alabama Supreme Court] has held is the date the first legal injury occurs," *Ex parte Abbott Lab'ys*, 342 So. 3d 186, 194 (Ala. 2021), or when the "claimant is entitled to maintain an action."  *Chandiwala v. Pate Constr. Co.*, 889 So. 2d 540, 543 (Ala. 2004).  When a plaintiff is "entitled to maintain an action," depends on the elements of that action; however, all actions require a legal injury,

---

[10]  "The statute of limitations for a nuisance claim is two years,"  *see, e.g.*, *Ex parte Brian Nelson Excavating, LLC*, 25 So. 3d 1143, 1145 (Ala. 2009); likewise for wantonness and negligence.  *See Ex parte Capstone Bldg. Corp.*, 96 So. 3d 77, 88 (Ala. 2012) ("We once again reaffirm the proposition that wantonness claims are governed by the two year statute of limitations now embodied in § 6-2-38(l) [, Ala. Code 1975].");  *Bush v. Ford Life Ins. Co.*, 682 So. 2d 46, 47 (Ala. 1996) ("The statute of limitations applicable to a negligence claim is two years.").  The statute of limitations for trespass is six years, but the court omits discussion of the applicability of the statute of limitations to the trespass claim because the trespass claim will be dismissed on the merits.  Ala. Code § 6-2-34.

therefore a plaintiff cannot be entitled to maintain an action at least until it has suffered a legal injury. *Id.* As discussed above, UBT has plausibly alleged a cognizable legal injury: dangerous drinking-water contamination that prevents UBT from delivering safe water to its customers. Accordingly, UBT was entitled to maintain an action when the source-water contamination manifested itself to an injurious level.[11] If it had brought its claims before then, the claim would not have been ripe for lack of a legal injury (that is, plaintiffs cannot sue for an unsafe drinking water source if the water is, in fact, safe to drink). *See Bhd. of Locomotive Firemen & Enginemen v. Hammett*, 140 So. 2d 832, 834–35, *as modified*, 144 So. 2d 58 (Ala. 1962) (holding that the "time of limitation begins to run when the injury happens or damage accrues, and not from the date of the act causing the injury or damage") (citing *Corona Coal Co. v. Hendon*, 104 So. 799, 800 (Ala. 1925)); *see also Cline v. Ashland, Inc.*, 970 So. 2d 755, 763 (Ala. 2007) (Harwood J., dissenting) *dissent adopted by Griffin v. Unocal Corp.*, 990 So. 2d 291, 298 (Ala. 2008) (noting that toxic substances may be introduced at one date, but that the injury may manifest at a much later, statute-triggering date.)[12]

---

[11] Again, there must be a *manifest*, legal injury to be cognizable under Alabama law. *Griffin v. Unocal Corp.*, 990 So. 2d 291, 293 (Ala. 2008) (adopting Justice Harwood's dissent in *Cline v. Ashland, Inc.*, 970 So. 2d 755, 761–77) ("[A] cause of action accrues only when there has occurred a *manifest,* present injury."); *see also Hinton*, 813 So. 2d at 829 ("Alabama law has long required a *manifest*, present injury before a plaintiff may recover in tort.") (emphasis added).

[12] As both parties seem to understand, the facts of this case do not fit squarely into Alabama's statute of limitations law, or lead to a clear pinpoint of the statute of limitations date.

The question then is when did UBT's injury manifest?  Though not addressing the term in the water-contamination context, the Alabama Supreme Court has defined "manifest" in the toxic-tort context to mean "an injury manifested by observable signs or symptoms or the existence of which is medically identifiable," or a "condition that has evidenced itself sufficiently that its existence is objectively evident and apparent, even if only to" an expert.  *Cline*, 970 So. 2d at 761, 770–74.

UBT alleges that the water-contamination injury manifested within the limitations period—when UBT's water supply tested positive for contaminants in excess of the EPA Advisory Guidelines.  (Doc. # 32 at 10).  Defendants argue that the water contamination manifested three years ago, outside of the limitations period, when UBT was sued for water contamination.  (Doc. # 27 at 10–11.)  At this stage, the court cannot declare as a matter of law which of these articulations, if

---

*See Ex parte Abbott Lab'ys*, 342 So. 3d at 195 (discussing the role of a defendant's conduct to the statute of limitations in the continuing tort context).  Indeed, the complexities of the word "accrual" in the context of toxic-tort cases is well known to the Alabama Supreme Court. *See Griffin*, 990 So. 2d at 298 (Smith, J., dissenting) (suggesting that the "the various types of toxic substances and injuries that [can] result from exposure to such substances" and "the science involved in detecting and diagnosing injuries or the manifestation of injuries resulting from such exposure" makes defining accrual a difficult task).  But Alabama law is clear that claims cannot accrue before there is a legal injury.  It does not matter how long in the past the tortious conduct occurred if the conduct has not yet caused a cognizable injury.  *See Payne v. Alabama Cemetery Ass'n, Inc.*, 413 So. 2d 1067, 1072 (Ala. 1982) (holding that where "the act complained of does not itself inflict a legal injury at the time it is done, but plaintiff's injury only follows as a result and a subsequent development of the defendant's act . . . the cause of action 'accrues,' and the statute of limitation begins to run, when and only when, the damages are sustained.") (internal quotations omitted).  Here, the action cannot have accrued until the water was contaminated to an unsafe level, regardless of when the defendant last engaged in tortious conduct and regardless of whether the water had previously contained PFAS at non-injurious levels.

either, is accurate.  The ultimate question is:  When did UBT's water source reach an injurious condition that "evidenced itself sufficiently [so] that its existence is objectively evident and apparent?"  *Cline*, 970 So. 2d at 773–74.  Answering that question will depend on evidence and factfinding, but the complaint's allegations sufficiently allege that the injurious condition manifested itself within the statute of limitations—which is all that a plaintiff need do at this procedural stage.[13]  *See Ex parte Abbott Lab'ys,* 342 So. 3d at 193 (holding that it must be "clear from the face of the complaint" that the claims "are barred by the . . . applicable statute of limitations" to warrant dismissal); *Travis v. Ziter*, 681 So. 2d 1348, 1351 (Ala. 1996) ("Dismissal based on the statute of limitations is proper only if, from the face of the complaint, it is apparent that the tolling provisions do not apply.").  Defendants may properly raise statute of limitations arguments again at summary judgment.[14]

---

[13]   Having found that, on its face, the complaint is not clearly barred by the statute of limitations, the court does not analyze several other issues: the continuing tort doctrine in light of *Ex Parte Abbot* and when the defendants last allegedly tortious conduct occurred, 342 So. 3d 186, 194 (Ala. 2021); "whether a discovery feature should apply" to this context, *Cline*, 970 So. 2d at 773–4 (Harwood, J., dissenting); whether other tolling provisions, such as fraudulent concealment, apply, Ala. Code § 6-2-3; and whether the abatable nuisance doctrine applies wherein "the cause of action does not arise until the harmful consequences occur, and *each occurrence or recurrence of such damages constitutes a separate cause of action*" with a new accrual date, *City of Birmingham v. Leberte*, 773 So. 2d 440, 444 (Ala. 2000) (emphasis added); (Doc. # 1 at 22 ("The nuisance has caused substantial damages and will continue to cause damages until it is satisfactorily abated.").

[14]   As already addressed, *supra* note 4, the court does not take judicial notice of the suit filed against UBT in 2019.  However, even if the court did judicially notice the existence of that case (*not* the alleged facts of that case), the outcome here would not change.  *See Grayson v. Warden, Comm'r, Alabama DOC*, 869 F.3d 1204, 1225 (11th Cir. 2017) (noting that the existence of allegations can be noticed but not the facts that support those allegations or the factual findings

C.   **Negligence (Count One)**

Under Alabama law, both negligence claims require a plaintiff to plausibly plead: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. *King v. W. Morgan-E. Lawrence Water & Sewer Auth.*, 2019 WL 1167787, at *4 (N.D. Ala. Mar. 13, 2019) (citing *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)). Defendants advance arguments as to duty, causation, and injury. As discussed above, UBT alleges a cognizable injury. The remaining arguments will be addressed in turn, and the court concludes that UBT has sufficiently stated claims for negligence.

### 1.  Duty

"The existence of a duty to the plaintiff is fundamental to a negligence claim." *Graveman v. Wind Drift Owners' Ass'n, Inc.,* 607 So. 2d 199, 203 (Ala. 1992) (citing *City of Bessemer v. Brantley*, 65 So. 2d 160 (Ala. 1953). Whether a legal duty exists is a question of law. *Albert v. Hsu*, 602 So. 2d 895 (Ala. 1992) (citing *Rose v. Miller & Co.,* 432 So. 2d 1237 (Ala. 1983)). "'In general, every person owes every other person a duty imposed by law to be careful not to [cause harm]. . . . The key factor

---

of a prior case). As Defendants argue, the prior suit arguably put UBT "on notice of its potential PFAS claims." (Doc. # 38 at 2.) However, notice of a potential injury is not the same as a "manifest," objective injury as required by Alabama's definition of "accrual." *Griffin v. Unocal Corp.,* 990 So. 2d 291, 293 (Ala. 2008). Accordingly, prior litigation may have put UBT on notice that someone else believed UBT's water was contaminated to an injurious level, but it cannot establish that UBT's water source was objectively, and manifestly, contaminated to an injurious level.

[in determining whether such a duty exists] is whether the [the plaintiff's] injury was foreseeable by the defendant.'" *Patrick v. Union State Bank*, 681 So. 2d 1364, 1368 (Ala. 1996) (quotation and internal quotation marks omitted).   UBT argues Defendants had a duty "to exercise due and reasonable care to prevent the release of PFAS into Alabama waterways."[15]  (Doc. # 33 at 8.)

Defendants advance two arguments as to why UBT has failed to allege a duty: (1) Defendants argue that a "mere supplier of a chemical product [does not have] any duty whatsoever to prevent the product's purchasers from discharging wastewater that may contain trace amounts of the chemical," (Doc. # 25 at 21), and (2) Defendants argue that the water contamination in UBT's water source and system was not foreseeable.  (Doc. # 25 at 28.)

The first argument is easily disposed of.  Defendants' framing of the duty question is an attempt to twist the issue and the allegations made by UBT.  Contrary to Defendants' framing, UBT does not allege Defendants have a duty to prevent misuse of their product post-sale.  Rather, UBT alleges Defendants have a duty to exercise reasonable care in supplying toxic chemicals and chemical-containing products when the foreseeable and normal use and disposal of those products causes

---

[15] While the question of duty is one of law, the question of "whether a person has exercised due care" is generally a "question of fact for the jury to determine." *Barnett v. Norfolk Southern Railway Co.*, 671 So. 2d 718 (Ala. Civ. App. 1995) (quoting *Adams v. Coffee Cnty.*, 596 So. 2d 892, 895 (Ala. 1992)).

dangerous water contamination.  Put differently, UBT does not allege that its water supply was contaminated by the intentional misuse of PFAS by a third party that Defendants supplied PFAS to, but as a predictable consequence of the chemicals' normal use as designed, manufactured, sold, and disposed.  Defendants do not cite any Alabama law supporting the application of their duty framework under these allegations, as there is none.[16]  In essence, Defendants advocate for a rule of law where there is always a bright line "point of sale cut off for a chemical supplier's duty to an end-use customer."  (Doc. # 25 at 23.)  Such a rule would run afoul of Alabama's foundational tort law principles of foreseeability and reasonableness. Simply put, chemical suppliers are not universally divested of a duty of reasonable care at the initial point-of-sale if the foreseeable, expected, and predictable result of

---

[16]  Defendants do cite many extra-jurisdictional cases as persuasive authority. (Doc. # 25 at 23.)  But all those cases deal with whether a supplier has a duty when the purchaser uses the goods in a non-foreseeable way, or in a way that constitutes a superseding event, that causes the ultimate injury.  Accordingly, those cases are inapposite and work, if at all, to support the well-settled premise that suppliers have a duty to exercise reasonable care when supplying goods where the normal and *foreseeable* use of those goods causes the plaintiff's injury.  And the same goes for the in-jurisdiction cases Defendants cite.  *See Tipler v. McKenzie Tank Lines*, 547 So. 2d 438, 440–41 (Ala. 1989) ("Exxon cannot be charged and held liable either for maintaining, or for failing to prevent, a chain of events and circumstances *over which it had no reasonable means of control*." (emphasis added)); *see also E. S. Robbins Corp. v. Eastman Chem. Co.*, 912 F. Supp. 1476, 1494 (N.D. Ala. 1995) (manufacturer not liable for chemical spill because it "had no control over the off-loading of [its] product by its carriers").  Here, UBT clearly alleges that Defendants had "a reasonable means of control" over the "chain of events and circumstances" that followed Defendants' design, manufacture, production, sale, and disposal of their chemicals. *Id.*; *see also Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1330 (N.D. Ga. 2022) (rejecting defendants' "control" argument because the plaintiff did not allege "*intentional misuse* of PFAS" but rather alleged that water contamination was the "predictable consequence of the chemicals' normal use" as sold by supplier defendants).

the sale itself was injury to the plaintiff.  Alabama law recognizes this, the Restatement of Torts recognizes this,[17] and courts across the country applying nearly identical duty tests to that of Alabama have concluded the same on materially similar allegations.[18]

---

[17] Section 389 of the Restatement provides: "One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put, is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent." Restatement (Second) of Torts § 389 (1965).  "Section 389 is simply a statement of basic negligence principles of foreseeability and fault in the supplier context."  *Buckingham v. R.J. Reynolds Tobacco Co.*, 142 N.H. 822, 713 A.2d 381 (N.H.1998).  "The relevant inquiry under section 389 is whether there is an unreasonable hazard to a plaintiff that is foreseen from the use of the product."  *Henry v. St. Croix Alumina, LLC*, 2007 WL 6030275, at *14 (D.V.I. Aug. 10, 2007) (citing *Maguire v. Pabst Brewing Co.*, 387 N.W.2d 565, 572 (Iowa 1986)).

[18] *See Middlesex Water Co. v. 3M Co.*, 2022 WL 16552920, at *5 (D.N.J. Oct. 31, 2022) (finding a defendant-supplier of PFAS has duties that "reasonably extend[] to any products containing PFAS that Defendant places into the market" and that those duties, like a duty to warn, applies to end-use plaintiffs, not just the initial purchaser);  *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1330 (N.D. Ga. 2022) ("That is, a duty arose where the Manufacturing Defendants continuously supplied PFAS to [a purchaser] with knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies.");  *Weirton Area Water Bd. v. 3M Co.*, 2020 WL 7479974, at *4 (N.D. W. Va. Dec. 18, 2020) (finding that a supplier-defendant owed a duty to public water customers whose water was contaminated because it "knew or should have known about the dangers PFAS posed to water" and that a manufacturing-defendant plausibly breached this duty by "negligently putting PFAS into the stream of commerce.");  *Menkes v. 3M Co.*, 2018 WL 2298620, at *5 (E.D. Pa. May 21, 2018)  ("[I]t is foreseeable to a manufacturer that toxic chemicals used at a particular facility will not necessarily remain confined to that facility, especially when those chemicals are in the form of a water-based foam that can leach into the groundwater.  It is equally foreseeable that such chemicals would harm the surrounding community.  This factor, therefore, weighs in favor of finding a duty.");  *see also Henry v. St. Croix Alumina, LLC*, 2007 WL 6030275, at *14 (D.V.I. Aug. 10, 2007) (finding a chemical supplier potentially liable for contamination when the chemicals it sold to a refinery ultimately injured third parties because the supplier "knew or had reason to know that the [chemical] was unlikely to be made . . . safe before being put to its *expected* use" and sold it anyways. (emphasis added)).

The appropriate inquiry then is whether Defendants have a duty to exercise reasonable care when supplying chemicals where the foreseeable and normal use of those chemicals, as supplied, causes the dangerous contamination of public drinking water. Defendants have such a duty. In determining whether a legal duty exists, that is, whether "the plaintiff's interests are entitled to legal protection against the defendant's conduct," courts must consider "public policy" and "social considerations." *Patrick v. Union State Bank*, 681 So. 2d 1364, 1368 (Ala. 1996) (quoting *Smitherman v. McCafferty*, 622 So. 2d 322, 324 (Ala. 1993)). However, as already stated, "the key factor [in determining whether a duty exists] is whether the [the plaintiff's] injury was foreseeable by the defendant." *Id.*

First, as to public policy, the allegations here weigh almost exclusively in favor of finding a duty. As the Alabama Supreme Court has stated: "We can think of no project more important than one to provide a pure water supply." *Hereford v. City of Linden*, 540 So. 2d 49, 51 (Ala. 1988). Moreover, the Alabama Supreme Court has stated that the contamination of a public water way constitutes a public nuisance. *Russell Corp. v. Sullivan*, 790 So. 2d 940, 952 (Ala. 2001) (citations omitted). And all nuisances require a legal duty. *See Tipler v. McKenzie Tank Lines*, 547 So. 2d 438, 440 (Ala. 1989). Accordingly, the Alabama Supreme Court has identified policy considerations and Alabama law establishing a duty to exercise

reasonable care when placing products into the stream of commerce that, in normal, predictable use, will dangerously contaminate public water ways.

Second, as to the foreseeability of harm to UBT, Defendants assert "[UBT] has not alleged any fact supporting foreseeability" because it "failed to allege that Defendants were aware of the operation of and discharges from the waste streams of each unnamed facility in Alabama." (Doc. # 25 at 29.)  This argument is not about the foreseeable consequences of defendants' actions and inactions (putting its products into the stream of commerce).  Rather, it is about whether there was, in fact, a superseding event that ultimately caused the water contamination (like a negligent third-party discharge as opposed to the foreseeable consequences of the expected use of Defendants' products).  Put differently, Defendants argue that UBT's failure to identify a relevant third-party tortfeasor at the motion to dismiss stage is affirmative evidence of a superseding intervening cause. This argument defies pleading standards by placing the imperative on a plaintiff to prove that a defendant is not liable due to an intervening cause before it can establish that a defendant did cause the harm.[19]

On the other hand, UBT alleges, as to foreseeability of the ultimate water contamination, that 3M "knew or should have known that, in their intended and/or

---

[19]  *See Middlesex Water Co. v. 3M Co*., 2022 WL 16552920, at *6 (D.N.J. Oct. 31, 2022) (addressing the same argument in the causation context and expressing confusion as to its logic).

common use, PFAS (including products containing PFAS and PFAS used in industrial processes) would contaminate the environment and harm Plaintiffs' drinking water," (Doc. # 1 at 13), and that "DuPont knew, or should have known, that PFAS would contaminate the environment and Plaintiffs' drinking water through their manufacturing, marketing, distribution, and sales of PFAS chemicals and consumer, household, and other commercial products and materials containing PFAS." (Doc. # 1 at 15.)

In support, UBT alleges that Defendants knew the following by the 1960s: that PFAS were toxic and could leach into groundwater through runoff from products like food packaging waste and industrial byproducts; that PFAS were biopersistent and bioaccumulative; and that PFAS were harmful to humans and the environment.  UBT also alleges that DuPont had, by 1980, internally confirmed that "continued exposure [to PFOA] is not tolerable," and that it accumulates over time in human bodies; that 3M knew that PFAS cannot be effectively treated by conventional wastewater treatment plants; that DuPont had internal positions to "totally eliminate" certain PFAS by 1984 but continued its production for economic reasons; that Defendants actively concealed its information and awareness of PFAS danger for decades, including its information about groundwater leaching and runoff, while continuing to mass produce and sell PFAS and PFAS-containing products; and that Defendants worked for years to control the science on PFAS by

intentionally misleading the public, regulators, and the scientific community.  (Doc. # 1 at 10–15.)

These allegations plausibly suggest that Defendants could have reasonably foreseen that supplying their chemicals to be used as intended would dangerously contaminate UBT's drinking water supply and are sufficient to plead the existence of a duty in this case, especially given the Alabama Supreme Court's declaration that it "can think of no project more important" than the provision of "a pure water supply."[20]  *Hereford*, 540 So. 2d at 51.

---

[20]   Indeed, the Alabama Supreme Court has for years recognized that there is a general duty to not make water unsafe for consumption:

> The old maxim, 'Aqua currit, et debet currere ut solebat,' is familiar to all. It means, in practical application, that water is the common and equal property of every one through whose domain it flows, and that the right of each to its use and consumption, while passing over his possessions is the same. He must so use it as not to destroy or unreasonably impair the equal rights of others. . . .

> [Any action] which defiles and corrupts [water] to such a degree as essentially to impair its purity, and prevent the use of it for any of the reasonable and proper purposes to which running water is usually applied . . . creates a nuisance, for which those thereby injured are entitled to a remedy. . .

> [No one has a right], in the absence of express grant or prescription, to pollute the waters of a stream and make it unfit for drinking purposes…

> [I]t is declared that actions may be maintained for the following causes: The casting upon one's own land of dirt and foul water, or substances which reach the stream by percolation; . . . the letting off of water made noxious by precipitation of minerals, . . . or rendering the water unfit for domestic, culinary, or mining purposes, or for cattle to drink of, or fish to live in, or for manufacturing purposes.

*Elmore v. Ingalls*, 17 So. 2d 674, 675 (Ala. 1944) (holding that it is an "inescapable" conclusion that a duty and a cause of action lies where a defendant causes water to be contaminated to a level that is "unfit" for consumption).

## 2. Causation

Defendants argue that UBT failed to plausibly allege proximate causation because UBT has not alleged that Defendants directly discharged PFAS into Tuskegee's drinking water. (Doc. # 38 at 14.) This argument is misguided and ignores well settled proximate causation principles related to causal chains and superseding intervening causes. Indeed, proximate cause is, by definition, not restricted to the "direct" or last-in-line cause. That is, liability does not necessarily stop at the domino that physically knocks over the plaintiff's domino, it can stretch back to dominoes further removed. Keeping in mind that causation is generally "a question of fact to be determined by the jury," and "becomes a question of law only when there is a total lack of evidence from which the fact-finder can reasonably infer a direct causal relationship between the culpable conduct and the resulting injury," it is clear that UBT has sufficiently alleged proximate causation. *Green v. Ala. Power Co.*, 597 So. 2d 1325, 1327–28 (Ala. 1992).

A cause is considered the proximate cause of an injury if, in the natural and probable sequence of events, and without intervention of any new or independent cause, the injury flows from the act. *City of Mobile v. Havard*, 268 So. 2d 805. 810 (Ala. 1972). Proximate cause is not met when there is an "intervening cause," which is defined as an act that "break[s] the chain of causation between [the defendant's] act and the resulting injury." *Haddan v. Norfolk S. Ry. Co.*, 2022 WL 333879, at *4

(Ala. Feb. 4, 2022) (quoting *General Motors Corp. v. Edwards*, 482 So. 2d 1176,

1195 (Ala. 1985)).  As recently reiterated by the Alabama Supreme Court:

> Not every cause which comes into operation after a tortfeasor has acted will relieve him of liability for his wrongful act. More than the proper temporal relationship between the tortfeasor's act and the subsequent cause is required. In order to be an intervening cause, a subsequent cause also must have been unforeseeable and must have been sufficient in and of itself to have been the sole 'cause in fact' of the injury. If an intervening cause could have reasonably been foreseen at the time the tortfeasor acted, it does not break the chain of causation between his act and the injury. Conversely, if the intervening cause was unforeseeable, the causal chain is broken. In the same respect, if the intervening cause is not sufficient to be considered the sole 'cause in fact' of the injury, if it is not in and of itself sufficient to stand as the 'efficient cause' of the injury, the causal chain is not broken; but, if the intervening cause was alone sufficient to produce the injury complained of, it is deemed the proximate cause of the injury and the tortfeasor or tortfeasors between whose acts and the injury the cause intervened are relieved of liability.

*Haddan*, 2022 WL 333879, at *4 (internal citations omitted) (quoting *Edwards*, 482

So. 2d at 1195).

In addition, "an injury may have several concurrent proximate causes, . . .

including the actions of two or more tortfeasors, neither of whose action was

sufficient in and of itself to produce the injury, who act, either together or

independently, to produce it."  *Haddan* 2022 WL 333879, at *4 (quoting *Edwards*,

482 So. 2d at 1195).  "Alabama law is clear that on such occasions, where the actions

of two or more tortfeasors combine, concur, or coalesce to produce an injury, each

tortfeasor's act is considered to be the proximate cause of the injury . . . and each

tortfeasor is jointly and severally liable for the entire injury."  *Id*.

Here, UBT plausibly alleges that it was foreseeable that Defendants' supply of PFAS and PFAS containing products would contaminate UBT's water source. UBT alleges that the natural use and disposal of PFAS and consumer products containing PFAS sold, manufactured, and distributed by Defendants caused the contamination of UBT's water source. (Doc. # 1 at 10, 21–23.) For example, UBT alleges that the foreseeable disposal practices of Defendants' products, like food-packaging waste, caused PFAS to leach into surface and groundwater, which in turn contaminated UBT's water source. Similarly, UBT alleges that the normal use of Defendants' household products predictably ran off into public sewer systems, which in turn necessarily flowed and leached into UBT's water source. Both allegations are plausible, and foreseeable, methods of indirect discharge. This is especially true given that UBT alleges that over 90 water-utilities across Alabama have PFAS contaminated water and that 3M and DuPont were either the sole or primary manufacturers of certain PFAS, like PFOA and PFOS. (Doc. # 1 at 9, 11.) Moreover, UBT alleges that Defendants knew that this type of indirect runoff/leachate contamination could happen, actively tried to suppress their knowledge, and continued to promote, design, manufacture, sell, and distribute PFAS for decades as if they did not know PFAS could contaminate drinking water sources, like UBT's, through PFAS's standard residential and industrial uses and disposal.

31

Whether UBT has sufficient evidence to back up these allegations (and whether Defendants have evidence establishing unforeseeable intervening causes) is a question for another day.  What is clear is that UBT has plausibly alleged proximate causation, which is all that is required at this stage.[21]  To the extent that Defendants argue that UBT's causation theory is too remote or attenuated, those arguments are premature and defy pleading standards.  *Green*, 597 So. 2d at 1328 (reiterating that causation is a question of fact unless there is a "total lack of *evidence*" from which a reasonable factfinder could infer proximate causation (emphasis added)).  Accordingly, Defendants' motions to dismiss UBT's negligence claims will be denied.

### D.   <u>Wantonness (Count Five)</u>

Like negligence, wantonness also requires duty, breach, causation, and injury.  As discussed, UBT plausibly pleads these elements.  But a wantonness claim has an additional element: intent.  *See Lemley v. Wilson*, 178 So. 3d 834, 841–42 (Ala.

---

[21]   There are also several persuasive authorities, applying the same causation principles, that have reached the same conclusion.  *Weirton Area Water Bd. v. 3M Co.*, 2020 U.S. Dist. LEXIS 237871, at *15-16 (N.D. W. Va. 2020); *Parris v. 3M Co.*, 2022 WL 976007 (N.D. Ga. Mar. 30, 2022)).  Indeed, an expert in a nearly identical case (in terms of theory) found that due to the defendants' sale of chemical products, it was "foreseeable" that PFOS "originating from Defendant's products would be released into waterways."  *Middlesex Water Co. v. 3M Co.*, No. 18CV15366 (EP) (ESK), 2022 WL 16552920, at *4 (D.N.J. Oct. 31, 2022) (denying summary judgment where a plaintiff water utility alleged that the "manufacture and sale of products containing PFOA and PFOS led to the discharge of these chemicals into the environment, which contaminated Plaintiff's public drinking water supply.").

2015). Defendants argue that UBT fails to state wantonness claims because the complaint is "wholly silent as to what specific act Defendants allegedly did to cause the contamination," and alleges "no facts" explaining why or how Defendants were "wanton, willful, and reckless." (Doc. # 25 at 37.) Defendants' argument disregards pleading standards. For the following reasons, UBT has sufficiently alleged Defendants' wantonness.

Under Alabama law, a claim of wantonness requires intent: "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty." *Lemley v. Wilson*, 178 So. 3d at 841–42 (quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)). Wantonness requires an awareness that under the "existing circumstances and conditions [defendant's] conduct would probably result in injury to another." *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 680 (Ala. 2001) (quoting *Weatherly v. Hunter*, 510 So. 2d 151, 152 (Ala. 1987) (internal quotations omitted). "[I]t is not necessary that the actor know that a person is within the zone made dangerous by his conduct; it is enough that he knows that a strong possibility exists that others may *rightfully* come within that zone." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (emphasis added) (quoting *Joseph v. Staggs*, 519 So. 2d 952, 954 (Ala. 1988)).

Contrary to Defendants' arguments, the complaint is rife with plausible allegations stating a claim for wantonness. Defendants argue that the complaint is "wholly silent" to the "specific act" Defendants did to cause the contamination. (Doc. # 25 at 37.) But the complaint is loud and clear on that front: "Defendants designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS and/or products containing PFAS that were delivered into areas, causing contamination through, *inter alia,* industrial processes and facilities; disposal by industrial process and facilities, wastewater discharge through such processes, and consumer use and disposal of PFAS containing products . . . of Plaintiffs' drinking water sources." (Doc. # 1 at 7.) The specific acts are clearly alleged: Defendants introduced dangerous chemicals into the stream of commerce while knowing that the chemicals would be used in a certain way that would predictably cause dangerous drinking water contamination. Defendants may believe that causation cannot be traced back to them as initial suppliers (and prefer to point the finger at individual citizens or third parties). But that does not permit the court to ignore, pre-evidence, the plausible theory of the complaint.

Defendants' second argument that the complaint lacks "facts explaining why or how Defendants were 'wanton, willful, or reckless'" is equally detached from the complaint. (Doc. # 25 at 37.) The complaint alleges that Defendants intentionally supplied PFAS, despite knowing, *for decades*, about (1) PFAS's harmful impact to

34

humans and the environment, (2) PFAS's persistence in the environment and ability to accumulate over time, (3) PFAS's capacity to infiltrate and contaminate public waterways through ground and surface water, (4) water utilities' reliance on public waterways, and (5) PFAS's inability to be effectively treated by conventional waste-water filtrations systems.  (Doc. # 1 at 12–15.)  Indeed, the complaint alleges DuPont held internal positions as far back as 1984 that PFOA be "totally eliminate[d]."  (Doc. # 1 at 14.)   Moreover, UBT alleges that Defendants took steps to conceal and suppress this knowledge for decades—allowing their toxic bioaccumulative, biopersistent chemicals to take root across 93 water supplies in Alabama, and in UBT's rightful water source.  All of these, if collectively true, sound in recklessness and are beyond sufficient to plausibly state that Defendants had an awareness that their "conduct would probably result in injury" to UBT as required for a wantonness claim.  *Armstrong*, 817 So. 2d at 680.

Defendants' motions to dismiss will be denied as to UBT's wantonness claim.

### E.    <u>Nuisance (Counts Two and Three)</u>

In Alabama, "[a] 'nuisance' is anything that works hurt, inconvenience or damage to another.  The fact that the act done may otherwise be lawful does not keep it from being a nuisance.  The inconvenience complained of must not be fanciful or such as would affect only one of fastidious taste, but it should be such as would affect an ordinary reasonable man."  Ala. Code 1975, § 6–5–120; *see also Russell*

*Corp. v. Sullivan*, 790 So. 2d 940, 951 (Ala. 2001).  Alabama's nuisance statute is to be "liberally interpreted to effect its broadly stated purpose (providing a remedy for 'anything that works hurt, inconvenience, or damage to another')."  *Tipler*, 547 So. 2d at 440 (quoting Ala. Code 1975, § 6–5–120).

UBT brings two types of nuisance claims: private and public.  "A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals.  A private nuisance is one limited in its injurious effects to one or a few individuals."  Ala. Code 1975, § 6–5–121.  For both, UBT alleges that Defendants have created a nuisance by dangerously contaminating a public water way that UBT relies on to supply safe drinking water to its surrounding community.  Defendants move to dismiss both claims on different grounds.  For the following reasons, the private nuisance claim will be dismissed, and the public claim will not.  As already addressed above, UBT sufficiently alleges duty and causation—both of which are elements of a nuisance claim.  *See supra* Section IV.C.1-2.  Therefore, only the disputed elements distinct to nuisance are discussed here.

### 1.  Private Nuisance (Count Three)

"A private nuisance is one limited in its injurious effects to one or a few individuals."  Ala. Code § 6–5–121 (1975).  Here, UBT alleges that its public water source has been contaminated and that that contamination has inconvenienced,

injured, and hurt it.  The Alabama Supreme Court has categorized the contamination of a public waterway as a *public* nuisance.  *See Sullivan*, 790 So. 2d at 952 ("The discharge of contaminants into a public body of water constitutes a public nuisance.") (citing *National Container Corp. v. State*, 189 So. 4 (Fla. 1939) and *People of the State of New York v. State of New Jersey*, 256 U.S. 296, 41 (1921)). This is because the dangerous contamination of a public water way necessarily has an "injurious effect" to anyone who wants to use and enjoy the water.[22]  Ala. Code § 6–5–121 (1975).  Thus, UBT fails to state a claim of private nuisance, and Defendants' motions to dismiss the claims brought in Count Three will be granted.

### 2.  Public Nuisance (Count Two)

"A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals."  Ala. Code § 6–5–121.  Contamination of a public water way is a public nuisance.  *Sullivan*, 790 So. 2d at 951–52.  Typically, a "public nuisance gives no right of action to any individual" and "must be abated by a process instituted in the name of the state."  *Id.* However, private plaintiffs have standing to bring a claim for public nuisance, if they show "special damage . . . different in kind and degree from the damage suffered

---

[22]   However, as discussed below in the public nuisance analysis, the injurious effects can vary greatly in both scope and type from person to person.

by the public in general." *Sullivan*, 790 So. 2d at 951 (reiterating that "special damage" is "damage that is different than that suffered by others").

While the public is certainly damaged by contaminated water in UBT's public water source, UBT suffers "special damage[s]" because it uses the water in a unique way that most of the public does not or cannot:  it draws, treats, and sells the water for consumption. *Id.* UBT is, by definition, an entity that has a special right of use to the water that is not granted to the public at large, and UBT alleges that the water contamination has inconvenienced that right.  (Doc. # 32 at 13 ("UBT's 'special damages' include . . . expenses associated with the future installation and operation of a filtration system capable of removing Defendants' chemicals from the water; expenses incurred to monitor PFAS contamination levels; expenses incurred to purchase water from any other water system; expenses to properly dispose of PFAS removed from drinking water; and lost profits and sales . . . These damages are unique and different from those who merely 'use and enjoy' the water.") (citations omitted).)  Unlike general public use, UBT's facility is practically rendered useless as long as the nuisance persists absent abatement.

Accordingly, UBT has sufficiently alleged special damages necessary to bring a public nuisance action.[23] *See W. Morgan-E. Lawrence Water & Sewer Auth.*, 208

---

[23] 3M argues that UBT does not suffer "special" damage because (1) it alleges that 90 other water utilities are similarly harmed, and (2) because anybody can draw water from the Alabama's public waterways.  (Doc. # 39 at 11–13.)  Both arguments are misplaced. First,

F. Supp. 3d at 1234 (finding that a water utility alleged special damages for public nuisance where it alleged harm from the "costs of . . . trying to remediate" water contamination in order to sell and drink the water); *King*, 2019 WL 1167787, at *5 (finding customers of a water utility suffered "special" damages from the water contamination of a public waterway necessary to state a public nuisance claim); *see also Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1341 (N.D. Ga. 2022) (finding that "costs incurred to obtain potable water sources" in PFAS contamination case amounted to "special damage" as necessary for a public nuisance action under Georgia law).

As a result, Defendants' motions to dismiss the public nuisance claims will be denied.[24]

## F.   Trespass (Count Four)

UBT's indirect trespass claims will be dismissed.   UBT alleges that Defendants committed an indirect trespass when they caused the contamination of a

---

approximately 90 other water utilities are a far cry from the "general" public (and none of these other utilities pull from UBT's water source). *See W. Morgan-E. Lawrence Water & Sewer Auth.*, 208 F. Supp. 3d at 1234 n.5 (finding that 25,000 people can suffer special damage that is not the same damage as the public at large).   Second, while it may be true that anybody can draw some amount of contaminated water from public waterways, the general public does not have the right to draw mass volumes of water to sell as safe drinking water, like UBT does.   Accordingly, UBT (and water utilities generally) suffer special damage from public water source contamination that the public does not.

[24] As discussed in the preceding duty analysis, Defendants' "control" arguments are inapplicable to the facts alleged in the complaint. *Supra* n.16.

public water source that UBT draws from to supply water to its community.

"[A]n indirect trespass occurs where the trespasser releases a 'foreign polluting matter' beyond the boundaries of his property, knowing to a 'substantial certainty' that it will invade the property." *Russell Corp. v. Sullivan*, 790 So. 2d 940, 946–47 (Ala. 2001) (quoting *Rushing v. Hooper–McDonald, Inc.*, 300 So. 2d 94 (Ala. 1974)). To succeed on a claim of indirect trespass, UBT must show: (1) an invasion affecting an interest in the exclusive possession of its property; (2) an intentional doing of the act which results in the invasion; (3) reasonable foreseeability that the act done could result in an invasion of its possessory interest; and (4) substantial damages to the Res.[25] *Borland v. Sanders Lead Co.*, 369 So. 2d 523 (Ala. 1979).

Trespass, unlike negligence, wantonness, and nuisance, requires an invasion of property in plaintiff's exclusive possession. As alleged, the facts here do not sound in trespass because, unlike other indirect trespasses, Defendants' PFAS did not cross onto UBT's boundary line by a natural process. *See Rushing*, 300 So. 2d at 97 (upholding indirect trespass claim where gravity, air, and water moved contaminants onto the property). Rather, UBT pulls the water onto its property through an intake system from a public waterway (over which UBT does not have

---

[25] Indirect trespass claims may lie where there is an "intrusion" onto one's real property that results in "substantial damage to the Res." *Borland*, 369 So. 2d at 523. "Res" is Latin for "thing" or "property," and is capitalized in Alabama Supreme Court opinions.

exclusive possession).   Accordingly, there is no invasion onto UBT's property. Dismissal is warranted on this basis.

Nonetheless, the court addresses Defendants' alternative argument: that water contamination cannot constitute "substantial damages" to the property.  (Docs. # 27 at 13, # 25 at 35.)  Defendants argue and cite *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co*., for the proposition that water contamination only constitutes "substantial damages" for trespass purposes if the plaintiff's structure (pipes, filtration tanks, etc.) are damaged by the contaminated water.  208 F. Supp. 3d 1227, 1235 (N.D. Ala. 2016) (dismissing water-contamination trespass claim because there was "no allegation of physical or structural damage" to the utility's pipes, grass, filtration systems).  To the extent that Defendants argue that water contamination can never constitute a trespass claim, that argument is wrong.  Trespass requires substantial damage to property.  "Property" damage is not constrained to buildings and infrastructure. *See Rushing*, 300 So. 2d at 99.  Property can be personal property, like a car, a fish, or, as in this case, water.  *Id.* (holding that damages for personal property is allowed in a trespass case).  Indeed, water itself can be both personal property and real property.  *Id*.  (assuming that the water in a pond constitutes traditional real property for trespass purposes).  And here, while UBT's building is not alleged to have been damaged by Defendants' PFAS, UBT's water (its property) *is* structurally, physically, actually, and substantially damaged by the alleged PFAS

41

contamination.    Water  can  be  property  (both  real  and  personal),  it  can  be substantially  damaged,  and  a  trespasser  of  real  property  can  be  liable  for  that damage.[26]  *See id.* at 99 (quoting the Restatement of Torts for the proposition that "[a] trespass on land [can] subject the trespasser" to liability for personal injuries and harm to "things").   However, implicit in the concept of "substantial damages" (and  trespass,  generally)  is  that  the  damaged  property  is  not  the  same  as  the trespassing agent.[27]  Here, the trespassing material (the contaminated water) and the allegedly damaged property (also, the contaminated water) are one in the same and therefore damage to the water itself cannot constitute substantial damages to the res.

UBT's indirect trespass claims fail (1) for want of an invasion of property in its exclusive possession because UBT itself pulled the water onto its property from a public water source, and (2) because the damaged property (the water) is the same as the trespassing agent (again, the water).  Defendants' motions to dismiss Count Four will be granted.

---

[26] If any confusion persists, imagine this hypothetical.  A person trespasses onto a farmer's land and pours cyanide into the farmer's above-ground water-tank.  The cyanide destroys the farmer's water but has no effect on the tank itself.  Clearly, the trespass has caused substantial damage to the res because the farmer's property—his water—has been destroyed for all intents and purposes.

[27] For example, if someone throws a baseball at a window, the homeowner could recover for the broken window, but he could not recover for damage to the baseball.

### G.   Whether Injunctive Relief Is Available (Count Six)

In Count Six, UBT asserts a claim for "Injunctive Relief."  (Doc. # 1 at 25.)
Contrary to the complaint's framing, this claim is not an independent cause of action
but a request for an equitable remedy in the form of an injunction.  *See W. Morgan-
E. Lawrence Water & Sewer Auth.*, 208 F. Supp. 3d at 1234.   However, the court
will address DuPont's arguments in support of its motion to dismiss this claim for
injunctive relief.  DuPont argues that injunctive relief is unavailable in this case
because a remedy at law (that is, money) is an adequate remedy to address UBT's
alleged injuries.  (Doc. # 25 at 32–33.)

Under Alabama law, money damages may be ordered alongside an injunction
to afford a plaintiff an adequate remedy.  *See Gregath v. Bates*, 359 So. 2d 404 (Ala.
1978).  A plaintiff need not elect between one or the other.  *Id.*  Rather, an injunction
is a proper remedy when money damages "is inadequate because of the nature of the
injury or because of a multiplicity of actions necessary to obtain relief."  *Id.*
Ultimately, to merit injunctive relief, a plaintiff must show irreparable injury in the
absence of an injunction that is not cured by money damages.  *Moore v. Walter Coke,
Inc.*, 2012 WL 4731255, at *20 (N.D. Ala. Sept. 28, 2012) (quoting *Siegel v. LePore*,
234 F.3d 1163, 1213 (11th Cir. 2000)).

Here, at least at this stage, UBT's allegations meet this test.  While UBT
requests money damages to install a water-filtration system, it is not clear that such

a filtration system is an adequate remedy for the alleged PFAS contamination.  This is because UBT alleges that Defendants' PFAS has a life that is potentially much longer than a new water-filtration system.  That is, if UBT receives money to build a new water-filtration system, UBT may find itself right back where it started years from now when that system inevitably fails and Defendants' PFAS contamination persists.  If such a scenario played out, then UBT would not have had an adequate remedy at law via monetary damages.  *See Martin v. City of Linden*, 667 So. 2d 732, 737 (Ala. 1995) (finding possible *future* contamination of a water supply irreparable injury for which there would be no adequate remedy at law).

Accordingly, at least at this stage, the court will not declare UBT's request for an order "enjoining Defendants from continuing the [tortious conduct] and requiring Defendants to take all steps necessary to remove their chemicals from Plaintiff's water supplies" to be unavailable.  (Doc. # 1 at 25.)  DuPont's motion to dismiss the "claim" in Count Six will be denied.

## H.   <u>Whether Tuskegee Has Sued All Necessary Parties</u>

Finally, DuPont argues that the entire complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(7) because UBT failed "to join a necessary indispensable party."  (Doc. # 38 at 14.)  DuPont contends that third parties are responsible for the alleged PFAS contamination through "improper[] disposal of

[PFAS] chemicals" and that UBT's failure to join these third parties is violative of Federal Rule of Civil Procedure 19, which requires joinder of a party if "in that person's absence, the court cannot accord complete relief among existing parties." (Doc. # 25 at 41); *see also* Fed. R. Civ. P. 19(a)(1)(A). This argument fails for several reasons.

First, contrary to DuPont's assertions, the complaint does not allege improper disposal of PFAS by unnamed entities. The complaint alleges that Defendants manufactured, distributed, and supplied PFAS that was used in its normal, foreseeable way and that foreseeable use caused the PFAS contamination (*not* improper use by third parties). Second, again contrary to DuPont's assertions, the complaint does not allege that UBT is aware of any third parties that caused the PFAS contamination, and, as already discussed, the court declines to take judicial notice of a separate lawsuit that operates under a different theory and that has its own factual record. *See supra* note 14.

Third, and more fundamentally, DuPont's motion is insufficiently developed to warrant dismissal. The Eleventh Circuit has articulated a two-part test for determining whether a party is indispensable: "First, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible. [Second,] [i]f the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must

inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1279–80 (11th Cir. 2003) (citation omitted).  The complaint may only be dismissed upon a finding that the absent party is "indispensable" to the litigation.  And a party can only be found indispensable *after* an analysis of the mandatory Rule 19(b) factors.[28]

DuPont fails to advance adequate arguments as to both prongs.  First, DuPont does not address whether the purportedly necessary (and absent) third parties can be joined under Rule 19(a); that is, whether the court would be divested of subject-matter jurisdiction if it joined the parties.  Second, assuming that the third parties cannot be joined, DuPont fails to analyze the "mandatory equitable factors" outlined in Rule 19(b).  *Santiago v. Honeywell Int'l, Inc.*, 768 F. App'x 1000, 1006 (11th Cir. 2019) (finding an abuse of discretion where a court did not analyze the four nonexclusive factors "that must be examined" to dismiss under Rule 19).  Without such arguments, the court cannot "in equity and good conscience" rule that third

---

[28]     After it is determined that a party is a required party under Rule 19(a), Rule 19(b) then sets forth four nonexclusive factors "that must be examined in each case to determine whether, in equity and good conscience, the court should proceed without a party whose absence from the litigation is compelled." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109 (1968).  These four factors include "(1) how prejudicial a judgment would be to the nonjoined and joined parties, (2) whether the prejudice could be lessened depending on the relief fashioned, (3) whether the judgment without joinder would be adequate, and (4) whether the plaintiff would have any alternative remedies were the case dismissed for nonjoinder." *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999).

parties (*who are not named in the complaint*) are indispensable and that the complaint should be dismissed.  Fed. R. Civ. P. 19(b).  Indeed, DuPont's motion does not mention the mandatory Rule 19(b) factors, let alone explain why dismissal is warranted under them.  (*See* Doc. # 25 at 39–44); *see also Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1347 (11th Cir. 2011) (holding that the party invoking Rule 19 carries the "burden to demonstrate which Rule 19(b) factors required dismissal").

At least on this motion, DuPont does not adequately show that the absent (and unnamed) third parties are required under Rule 19(a), let alone indispensable under Rule 19(b).  Accordingly, DuPont's motion to dismiss under Federal Rule of Civil Procedure 12(b)(7) will be denied.  *See Temple v. Synthes Corp.,* 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit  . . . .  The Advisory Committee Notes to Rule 19(a) explicitly state that a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability.").

## V. CONCLUSION

For the reasons outlined above, it is ORDERED as follows:

1. The motion to dismiss filed by E.I. du Pont de Nemours and Company, the Chemours Company, and the Chemours Company FC, LLC is granted in part and denied in part.  (Doc. # 25).  It is GRANTED as to

Counts Three and Four, but DENIED as to Counts One, Two, Five, and Six.

2.  The motion to dismiss filed by 3M Company, Inc. is granted in part and denied in part.  (Doc. # 27).  It is GRANTED as to Counts Three and Four, but DENIED as to Counts One, Two, Five, and Six.

3.  The claims for negligence, wantonness, and public nuisance alleged by the Utilities Board of Tuskegee shall proceed against all Defendants.

4.  The claims for trespass and private nuisance alleged by the Utilities Board of Tuskegee are dismissed with prejudice.

DONE this 9th day of February, 2023.

_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE